## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA
ex rel. KAREN CLARK, and STATE
OF NEW MEXICO ex rel. KAREN
CLARK, and KAREN CLARK, individually,

Plaintiffs,

vs.

No. 13-CV-372
(Filed Under Seal pursuant to 31 U.S.C. §3730 (b)(2))
Jury Trial Demanded

UNITEDHEALTH GROUP, INC.,
UNITED HEALTHCARE INSURANCE COMPANY,
UNITED BEHAVIORAL HEALTH, INC., and
OPTUMHEALTH NEW MEXICO

Defendants.

## COMPLAINT FOR DAMAGES AND PENALTIES

Relator Karen Clark, pursuant to the provision of the False Claims Act, 31 U.S.C. §3729

et seq., brings this action on behalf of the United States, and pursuant to the provisions of the

New Mexico Fraud Against Taxpayers Act, §44-9-1 et seq. NMSA 2007, brings this action as a

qui tam Plaintiff on behalf of the State of New Mexico. Additionally, Karen Clark brings an

action for whistleblower retaliation on behalf of herself pursuant to §44-9-11 NMSA 2007. For

her Complaint, Karen Clark states:

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and

1355, and 31 U.S.C. § 3732(a) and (b), and has supplemental jurisdiction over the Relator's state

law claims pursuant to 28 U.S.C. §1367.

2.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 1395, and 31

U.S.C. § 3732(a) and (b) because the acts alleged in this complaint occurred in the District of

New Mexico.

3.     Relator/qui tam Plaintiff Karen Clark ("Clark") brings this action under the False Claims Act on behalf of and on the relation of the United States of America, and brings this action under the New Mexico Fraud Against Taxpayers Act as a qui tam Plaintiff on behalf of the State of New Mexico.  Additionally, she brings this action as a Plaintiff for whistleblower retaliation.

4.     Relator/qui tam Plaintiff Karen Clark is a citizen of the United States and a resident of the State of New Mexico.  From October 10, 2011, through April 9, 2012, Clark was employed by defendant UnitedHealth Group, Inc., as a Senior Investigator within a division of UnitedHealth Group Inc.'s, Optum Behavioral Health Solutions (OHBS).  Specifically, Relator/qui tam Plaintiff Clark worked for the Special Investigations Unit (SIU) of OptumHealth Behavioral Solutions.  At all material times, OptumHealth Behavioral Solutions' (OHBS) Special Investigations Unit (SIU) conducted investigations of allegations of fraud and abuse for and on behalf of Defendant OptumHealth New Mexico and other OptumHealth businesses within the United States of America.

5.     Defendant UnitedHealth Group, Inc. is a Minnesota corporation engaged in the business of providing managed health care through various subsidiaries, operating companies, and joint ventures including Defendant United Healthcare Insurance Company, Defendant United Behavioral Health, and Defendant OptumHealth New Mexico.

6.     Defendant United Healthcare Insurance Company is an insurance company organized under the law of Minnesota, is a subsidiary of UnitedHealth Group, Inc., which underwrites insurance provided by United Healthcare and at all material times did business in the

State of New Mexico.

7.      Defendant United Behavioral Health, Inc., is a California corporation engaged in the business of providing behavioral health services, is a subsidiary of UnitedHealth Group, Inc., and at all material times did business in the State of New Mexico.

8.      Defendant OptumHealth New Mexico is a joint venture between Defendants United Healthcare Insurance Company and United Behavioral Health, Inc. which is engaged in the business of providing behavioral health services in the State of New Mexico and at all material times did business in the State of New Mexico.

9.      Between January 22, 2009, and the present, Defendants United Healthcare Insurance Company, United Behavioral Health, Inc., and OptumHealth New Mexico had a contract (hereinafter "the contract")  with the State of New Mexico Interagency Behavioral Health Purchasing Collaborative (hereinafter "Collaborative") pursuant to which they were obligated to provide behavioral health services to New Mexico residents.

10.     The Collaborative is a legal entity in the State of New Mexico comprised of the following New Mexico State agencies:  Department of Health (DOH), Human Services Department (HSD), Children Youth and Families Department (CYFD), Aging and Long Term Services Department (ALTSD), Department of Finance and Administration )(DFA), Mortgage Finance Authority (MFA), Public Education Department (PED), Department of Transportation (DOT), New Mexico Corrections Department (NMCD), Division of Vocational Rehabilitation (DVR, Department of Labor (DOL), Health Policy Commission (HPC), Developmental Disabilities Planning Council (DDPC), Governor's Commission on Disabilities (GCD), Indian Affairs Department (IAD), Governor's Senior Health Policy Advisor, and the Administrative

Office of the Courts (AOC)(hereinafter collectively referred to as "member agencies").

11.     The contract provided that the Defendants would provide behavioral health services for and on behalf of the Collaborative and member agencies, and that all such services provided under the contract were subject to, among other things, Title XIX and XXI of the Social Security Act, the Code of Federal Regulations, Title 42, Parts 430 to end, all applicable statutes, regulations and rules promulgated by the federal government, the State of New Mexico, and the New Mexico Human Services Department's Medical Assistance Division (HSD/MAD) concerning Medicaid services, HSD/MAD's program eligibility and provider manuals, HSD/MAD's Policy and Systems Manuals, all applicable statutes, regulations and rules implemented by the State of New Mexico concerning managed care organizations, health maintenance organizations, insurance companies, and fiscal and fiduciary responsibilities under the Insurance Code of New Mexico.

12.     Under the contract, Defendants were authorized to provide behavioral health services through subcontractors.  Defendants entered into a number of contracts with subcontractors who provided behavioral health services to New Mexico residents under the Defendants' contract with the State of New Mexico.

13.     The contract required the Defendants to comply with all applicable provisions of federal and state laws and regulations, and to employ a contract manager who was responsible for ensuring the Defendants complied with the terms of the contract and for overseeing all of the activities of the Defendants' subcontractors.  At all material times, Defendants' contract manager was Elizabeth Martin.

14.     The contract required the Defendants to monitor subcontractors on an ongoing

basis and to review subcontractors on a periodic basis.

15.     The contract required the Defendants to be responsible for reimbursing providers of behavioral health services in accordance with the requirements of the contract and to ensure that they received required reports and data from all subcontractors providing behavioral health services on its behalf.

16.     The Defendants were further required under the contract to:

a.      ensure its subcontractors were in compliance with all federal and state laws;

b.      have and implement policies and procedures to address the prevention, detection, preliminary investigation, and reporting of potential fraud and abuse on the part of its subcontractors;

c.      have specific controls for the prevention and detection of fraud and abuse such as claim edits and post processing reviews of claims submitted by subcontractors;

d.      report any activity on the part of subcontractors which the Defendants believed were suspicious or indicative of fraud and abuse within five days of their becoming aware of such activities;

e.      conduct provider profiling to identify potential fraud and abuse on the part of their subcontractors;

f.      cooperate with any member agency and other investigatory agencies;

g.      have and implement policies and procedures for disciplinary action for employees who did not report fraud and abuse or who destroyed evidence relating to fraud or abuse;

h.      establish policies for its employees regarding compliance with the federal False Claims Act and the New Mexico Medicaid False Claims Act; and

I.      process subcontractor claims for payment in accordance with federal and state laws, rules and regulations, and the terms of the contract.

17.     All of the behavioral services which the Defendants and its subcontractors were responsible for providing under the contract were paid for by the Medicaid program administered by the New Mexico Human Services Department, and other federal and state funding sources including funds provided by the New Mexico Corrections Department, the New Mexico Aging and Long Term Services Department and the Children, Youth and Families Department.

## The Medicaid Program

18.     Medicaid is a federally assisted grant program for the states. Medicaid enables the states to provide medical assistance and related services, including behavioral health services to needy individuals. The Centers for Medicare & Medicaid Services (CMS) administers Medicaid on the federal level, while the New Mexico Human Services Department's Medical Assistance Division administers payments under the Medicaid program to providers of behavioral health services at the state level.

19.     Under the Medicaid program, the state directly reimburses providers of behavioral health services for services actually rendered, with the State obtaining the federal share of the payment from accounts which draw on funds of the United States Treasury. 42 C.F.R. §§ 430.0 to 430.30.

20.     The State of New Mexico participates in the Medicaid Program. At all times relevant to this Complaint, the United States provided funds to the State of New Mexico through

the Medicaid program, pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq. which were used to reimburse providers of behavioral health services under the provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act, including the Defendants and their subcontractors. By becoming a participating provider in Medicaid, the Defendants and their subcontractors as providers, agree to abide by the rules, regulations, policies and procedures governing reimbursement, and to keep and allow access to records and information required by Medicaid. In order to receive Medicaid funds, enrolled providers, together with authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the State of New Mexico.

21.     The New Mexico Medicaid Program submits claims for payment to the United States government. The State of New Mexico receives matching funds for services covered by the Medicaid program. Quarterly, the State of New Mexico receives an advance of funds from CMS, the amount of which is based on the State's estimate of Medicaid expenditures for that quarter, and is obtained through the State's submission to CMS of that estimate along with the State's certification that state and local matching funds are or will be available that quarter. To officially receive the federal matching funds, the State of New Mexico is required to submit to CMS documentation of actual Medicaid expenditures after the end of each quarter. CMS then reviews reported Medicaid expenditures to ensure that they are allowable under the Medicaid program, and reconcile the documented expenditures to the State's quarterly estimate. Therefore, false claims for payment made on the New Mexico Medicaid program in turn cause false claims for payment of federal funds to be presented to an officer or employee of the federal government.

22.     Under the New Mexico Medicaid Program, the United States pays a majority of the costs, while the State of New Mexico pays the balance of the costs.

23.     Among the rules and regulations which enrolled providers agree to follow are those which require, inter alia that:

(a)     the provider neither bills the CMS for any services or items which were not performed or delivered in accordance with all applicable polices, nor submits false or inaccurate information to the CMS relating to provider costs or services;

(b)     the provider be fully licensed and/or certified under all applicable state and federal laws to perform the services provided to the recipients;

(c)     the provider comply with state and federal statutes, policies and regulations applicable to the Medicaid program; and

(d)     the provider not engage in any illegal activities related to the furnishing of services to recipients.

**Medicaid Requirements for Behavioral Health Service Providers**

24.     Behavioral health service providers such as the Defendants and their subcontractors that participate in the Medicaid program must meet specific requirements in order to qualify for participation in and to bill for and receive taxpayer dollars from the Medicaid program.

25.     A New Mexico Medicaid provider is any individual, corporation, partnership, or other association who provides treatment, goods and services to beneficiaries of, and bills such items to, the New Mexico Medicaid Program.  NMSA 1978 § 30-44-2 (K), (M), and (N).

26.     New Mexico Medicaid provider agreements into which Defendants and their

subcontractors entered provided, inter alia, that the following conditions would be fulfilled as prerequisites to enrolling in and receiving payment from the New Mexico Medicaid program:

(a)     To abide by all Federal, State and local laws, regulations, and policies applicable to providers of medical services under New Mexico Medicaid and other health care programs administered by the State of New Mexico Human Services Department;

(b)     To comply with all billing instructions, reimbursement, audit, recoupment, and withholding provisions distributed by the New Mexico Human Services Department;

(c)     To render covered services to eligible clients in the same scope, quality, and manner as provided to the general public;

(d)     To assume responsibility for any and all claims submitted under and on behalf of behavioral health facilities' provider number;

(e)     To assume sole responsibility for all applicable taxes, insurance, licensing, and other costs of doing business;

(f)     To maintain and keep updated program policies, instructions on billing and utilization review, and other pertinent material distributed by the New Mexico Human Services Department;

(g)     To maintain and  retain any and all original medical or business records as are necessary to verify the treatment or care of any client for which any behavioral health and substance abuse provider or provider group contracted with OHBS and OHNM received New Mexico Medicaid payments from the New Mexico Human Services Department; and

(h)     To abide by and be held to all Federal, State and local laws, rules, and regulations, and to swear under penalty of perjury that the information given was true and accurate.

27.     Once enrolled as a New Mexico Medicaid behavioral health facility, providers, including Defendants and their subcontractors, receive a packet of information, including Medicaid program policies, billing instructions, utilization review instructions, and other pertinent material from the State of New Mexico's Medicaid fiscal agent, OHNM.  The Defendants and their subcontractors are responsible for ensuring that they have received these materials and for updating them as new materials received from the State of New Mexico Human Services Department, Medical Assistance Division ("MAD"). MAD-731.1.

28.     Pertinent to this case, the State of New Mexico by regulation imposes requirements regarding the operation of behavioral health and substance abuse facilities, which *inter alia,* provide:

(a)     Providers who furnish services to New Mexico Medicaid recipients must comply with all specified Medicaid participation requirements, including compliance with all relevant Federal and State laws and regulations. § 8.302.1.11 NMAC (see also former MAD-701, 731.2); and

(b)     Providers must maintain records which are sufficient to fully disclose the extent and nature of the services furnished to recipients. § 8.302.1.17 NMAC (see also MAD-731.2)

29.     Federal Medicaid requirements for behavioral health and substance abuse facilities are set out in 42 U.S.C. §§ 1396 et. seq., and 42 C.F.R. §§ 483.1 et. seq.

## ALLEGATIONS COMMON TO ALL CLAIMS

30.     At all times relevant to this Complaint, Defendants billed the Medicaid program, and other programs funded by the federal and state governments for behavioral health care and

treatment which was not appropriately documented, documented by falsified records, provided by unlicensed providers, not medically necessary, billed using inapplicable and improper billing codes, and which was not, in fact, provided.

31.     The Medicaid program constituted a significant source of gross revenue for Defendants.

32.     Under the contract, Defendants received twenty eight percent of every claim for services submitted to it by subcontractors which was paid, and therefore had an economic incentive to pay and not deny, or seek recoupment of payments on such claims.

33.     Between October 1, 2011 and the filing of the Complaint, Defendant OHNM received and paid out a total of approximately $88.25 million dollars in Medicaid funds in reimbursement of claims submitted by it and its subcontractors each quarter and thus was paid from each quarterly payment from the federal and state governments approximately $24.7 million dollars.

34.     At all relevant times, Defendants provided behavioral health services under the contract through subcontractors located throughout New Mexico which provide behavioral health services to Medicaid beneficiaries including, but not limited to the following subcontractors:

(a)     Family Connections, which had a medical facility located at 103 Holtz Drive, Grants, New Mexico, 87020;

(b)     Ann Morrow & Associates, which had a medical facility located at 6666 4th Street Northwest, Los Ranchos, New Mexico 87107;

(c)     Gerard Weideman dba Studio Best, which had a medical facility located at

2977 Mesilla Hills Drive, Las Cruces, New Mexico, 88005;

(d) Carlsbad Mental Health Center, which had a medical facility located at 914 North Canal Street, Carlsbad, New Mexico 88220;

(e) New Mexico Psychiatric Services, which had medical facilities located at 1700 North Union Avenue, Roswell, New Mexico 88201; 502 West Bronson Street, Carlsbad, New Mexico 88220, and in Artesia, Portales and Albuquerque, New Mexico;

(f) Covenant Child, Inc., which had medical a facility located at 100 South Kentucky Ave, Roswell, New Mexico 88203;

(g) Dr. Cynthia King, which had a medical practice located at 2211 Lomas Boulevard Northeast, Albuquerque, New Mexico 87106;

(h) Southwest Counseling Center, which had a medical facility located at 100 West Griggs Avenue, Las Cruces, New Mexico 88001; and

(I) Presbyterian Medical System - Residential Treatment Center for Juveniles, which had a medical facility located at 851 Andrea Drive Suite 4, Farmington, New Mexico 87401.

35. At all relevant times, Defendants "knowingly", as defined in 31 U.S.C. § 3729(b) and §44-9-2.C NMSA, received, processed and approved billings and claims for payment submitted by and received from Family Connections, Ann Morrow & Associates, Gerard Weideman dba Studio Best, Carlsbad Mental Health Center, New Mexico Psychiatric Services, Covenant Child, Inc., Dr. Cynthia King, Southwest Counseling Center, and Presbyterian Medical System, and submitted those claims for payment to the Medicaid program and other programs jointly funded by the federal and state government, and knowingly accepted and approved of

their subcontractors' receipt of Medicaid funds.

36.     At all material times, the Defendants knew that the claims for payment they were submitting to the Medicaid and other government funded programs and for which it was issuing payment to its above-named subcontractors were false within the meaning of the federal False Claims Act and the New Mexico Fraud Against Taxpayers Act and that its subcontractors were not eligible to be reimbursed for those claims for payment under the Medicaid and other federally and state funded programs which Defendants were responsible for administering on behalf of the State of New Mexico under its contract.

37.     Defendants obtained reimbursement from Medicaid and other government funded programs, and paid federal and state funds to its subcontractors in reimbursement of claims for payment submitted by its contractors which they knew were false and obtained a monetary benefit from the payment of all such claims equal to approximately twenty eight percent of every claim paid.

38.     The claims submitted by the Defendants' subcontractors and paid by the Defendants constituted false claims within the meaning of the False Claims Act, 31 U.S.C. §3729 et seq. and the New Mexico Fraud Against Taxpayers Act, §44-9-1 et seq. because they falsely represented that: (a)  services had been rendered on dates and at times when such services had not been rendered; (b) services had been provided by licensed personnel or otherwise qualified personnel eligible to bill the Medicaid program when such services had not been provided by licensed providers or personnel otherwise qualified to be reimbursed by the Medicaid program; (c) services billed for had been adequately documented as being provided when no or insufficient documentation of those services existed or when documentation of those

services had been falsified; (d) services had been billed for under correct and appropriate billing codes when in fact claims were submitted using inapplicable and improper billing codes; (e) and services had not been billed for twice under different government funded programs when in fact Defendants sought and obtained reimbursement of the same services from multiple governmental funding sources.

**Claims Submitted By and on Behalf of Family Connections**

39.    Relator/qui tam Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

40.    Defendants' subcontractor, Family Connections, contracted with Defendants to provide behavioral health services to persons on probation under a contract with the New Mexico Corrections Department (NMCD) which were paid for under the Medicaid program.

41.    Beginning in approximately March of 2011at the latest, and continuing over a period of at least six months, NMCD notified the Defendants and specifically including but not limited to, OHNM contract manager, Elizabeth Martin, orally and in writing, that NMCD was receiving multiple complaints from probationers that behavioral health services which probationers were required to receive as a condition of their probation were not being provided by Family Connections and that NMCD believed that Family Connections billed for and had been reimbursed under the Medicaid program for providing behavioral health services to these individuals for services that had not been provided.

42.    The behavioral health services which the probationers were supposed to be provided with included anger management, substance abuse and sex abuse counseling.

43.    Defendant OHNMs' contract manager, Elizabeth Martin, OHNM Regional

Director, Pam Valencia, and investigators within OptumHealth Behavioral Solutions' (OHBS) Special Investigations Unit did not respond to NMCD's reports and complaints or forward those reports to the State of New Mexico as it was required to do under the contract. Defendant OHNM's Chief Operations Officer, Marilyn Van Horn, and the supervisor of OHBS' Special Investigations Unit, Patricia LeFort, took no action to investigate or otherwise look into those complaints to ascertain their veracity, and executive management of UnitedHealth/OHBS (COO Van Horn and CFO Vogel), and UnitedHealth/OHBS managers Popillo and LeFort justified the non-response to these complaints on the basis that the payments being made to Family Connections were not substantial enough to warrant an investigation. At a meeting, Van Horn and LeFort instructed Relator/qui tam Plaintiff Karen Clark to not pursue the investigation and to not reply to requests being made by NMCD officials.

44.    In November of 2011, Relator/qui tam Plaintiff initiated an investigation into these reports after receiving additional reports and complaints from Amy Pearson, a hearing officer employed by the Probation and Parole Division of the New Mexico Corrections Department**,** that Family Connections was not providing probationers with court mandated behavioral services.

45.    Relator/qui tam Plaintiff reported to Defendant OHNM's Regional Director, Pam Valencia, who had been receiving reports of services not being rendered by Family Connections for several months, that Family Connections had been submitting CMS form 1500s, the federal form used by behavioral health care providers to seek Medicaid reimbursement, which claimed that a single, individual employee of Family Connections had provided between 18 and 26 hours of treatment a day, that Family Connections' billings were false, and that this provider had over-

billed the Medicaid program.

46. Defendants failed to take any action or conduct any investigation of the Relator/qui tam Plaintiff reports and continued to process claims for payments submitted by Family Connections and reimburse Family Connections for those claims.

47. Relator/qui tam Plaintiff also reported to the Defendants that the individual claiming to provide behavioral health services on behalf of Family Connections was not licensed to provide the services Family Connections billed Medicaid for and that Family Connections had no other employee who was licensed to provide those services, and that Family Connections claims for payment for those services was contrary to the requirements of the Medicaid General and Behavioral Health Provider Policies, NMAC 8.310.8.10.F, and NMAC 8.310.8.16.F.

48. On December 15, 2011, Relator/qui tam Plaintiff conducted an investigation of Family Connections which determined that Family Connection's client files did not contain treatment plans, treatment notes or other documentation showing what services had been provided to clients or which supported the claims for Medicaid payment that had been submitted by Family Connections as required by MAD-MR:08-11; NMAC §8.302.1.17;42 C.F.R. 431.107(b); §27-11-1 et seq.

49. The head of Defendant OHBS' Special Investigations Unit, Patricia LeFort, falsely represented the findings of that investigation as well as the statements made by probationers ordered to receive care at Family Connections who were interviewed during the course of the Relator/qui tam Plaintiff's investigation, and failed to take any action to investigate this provider, seek recoupment of the monies already paid to it, or stop further payments to Family Connections. Specifically, LeFort reported that the interviewees had stated they had

received treatment when in fact the interviewees stated they had not received treatment

50.     Defendants also ignored and failed to investigate or take any action in response to Relator/qui tam Plaintiff's reports that Family Connections had billed for services allegedly provided  when its offices were closed, for services which were actually provided by probationers rather than licensed providers, and had billed for services allegedly provided to one probationer who  had absconded and was being tracked by the United States Marshals Service and while that individual was being detained in another city.

51.     The Relator/qui tam Plaintiff also discovered that Family Connections had submitted claims for payment to the Medicaid program and received payment of claims for group therapy services that had been provided by the patients themselves, and had submitted claims for and received payment for allegedly providing services to a probationer who had absconded and was no longer in the county where Family Connections provided services.

52.     In March of 2012, the Defendants concealed this subcontractor's non-compliance with Medicaid rules and regulations and its false billings when it failed to respond to requests from the New Mexico Attorney General's office for an accounting review of this subcontractor's claims.

53.     The amount of Medicaid funds paid to this provider in reimbursement of false claims is at least $240,000.00.  The Defendants received twenty-eight percent of the government funds used to reimburse the subcontractor for false claims.

**Claims Submitted by and on Behalf of Ann Morrow and Associates**

54.     Relator/qui tam Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

55.     The Defendants contracted with Ann Morrow and Associates to provide behavioral health services under Defendants' contract.

56.     Over the course of approximately two years between approximately August of 2009 and October of 2011, the Defendants received multiple complaints from consumers of services and from employees of this subcontractor that consumers of this provider's services were not receiving the services they were supposed to be receiving and that this provider was engaging in false and fraudulent billing practices under the Medicaid and other federally funded programs.

57.     In November of 2011, Relator/qui tam Plaintiff initiated an investigation of this provider's claims, and was told by the Manager of OHBS' Special Investigations Unit to use only claims data supplied by the manager of OHBS' business operations division, Amanda Johnson.

58.     The data supplied by this individual indicated only $200,000 worth of claims had been paid to this provider when in fact at least $300,000 had been paid to this provider in payment of claims submitted to the Medicaid program, and did not contain historical data on complaints of false billing received over the course of the preceding two years.

59.     Despite the fact complaints from consumers and employees continued to be received, OHNM's COO and OHBS' Special Investigations Unit Director Joseph Popillo informed the Relator/qui tam Plaintiff that this provider was not important, too small to be concerned about, and to not waste her time investigating this provider.

60.     At all material times, OHNM used a claims processing system that it knew to be inadequate in that it did not accurately report the amount of claims submitted by subcontractors,

did not contain operable "file edits" designed to identify potentially false or fraudulent claims such as claims seeking reimbursement for providers who exceeded normal and feasible operating hours, claims seeking reimbursement for the provision of services to clients who received the same services over the course of multiple years, or claims submitted for inordinate numbers of clients who were claimed to be receiving services at the same locations.

61.     Relator/qui tam Plaintiff reported to the Defendants that this subcontractor submitted false claims for payment to the Medicaid program which used the billing code for "insight oriented psychotherapy" when the actual services rendered were teaching a client activities such as how to brush their teeth and were therefore not eligible for Medicaid reimbursement under the billing code used by this subcontractor.

62.     The Defendants had previously identified this subcontractor as one which likely over billed Medicaid by among other things, billing for providing the same services to the same clients several times a month over the course of multiple years, and had failed to conduct any investigation into this probable over billing.

63.     The Defendants determined as a result of an investigation conducted by the Relator/qui tam Plaintiff that this subcontractor had falsified patient file documents to support Medicaid claims, that its files did not contain documentation to support Medicaid claims, and was that it was in violation of MAD-MR:08-11 and NMAC 8.310.8.13, NMAC 8.310.8.17, 42 C.F.R. §431.107.

64.     Relator/qui tam Plaintiff's investigation also determined this contractor had billed for services that were not in fact provided and had provided treatment that was not medically necessary.  Relator/qui tam Plaintiff informed the Defendants, including OHBS' SIU supervisor,

who was present during interviews of employees of Ann Morrow and Associates when those employees reported billing for services not provided and for billing non-medically necessary services, of her findings.

65.     The Relator/qui tam Plaintiff also reported to the Defendants that this subcontractor had billed Medicaid for providing interactive therapy to clients who were non-verbal and thus unable to physically participate in interactive therapy, for psychotherapy which was not provided, for individual therapy under a higher paying billing code when only group therapy, which was supposed to be billed under a different, lower paying code had been provided, had routinely double billed Medicaid and other government funding sources, and had submitted claims for payment for behavioral support counseling which had been provided by therapists who were not licensed to provide such services and who were therefore ineligible for Medicaid reimbursement.

66.     The Relator/qui tam Plaintiff also determined and informed the Defendants that this provider had engaged in "upcoding" by using the higher paying billing code for psychotherapy when only community based support services had been provided, and by using code 90806 which was to be used to bill for face to face individual psychotherapy, 45-60 minutes in duration, when in fact it had provided services to clients who were not physically or developmentally capable of engaging in such treatment.

67.     Relator/qui tam Plaintiff also determined and reported to the Defendants that this provider had routinely used code 90808 for face to face, individual psychotherapy of 75 to 80 minutes in duration to bill Medicaid when it actually provided group therapy which was supposed to be billed under a different, lower paying code.

68.     Relator/qui tam Plaintiff confirmed and reported to the Defendants that this provider used code 90853 to bill Medicaid when it provided group therapy to developmentally disabled clients who did not have the capacity for insight oriented psychotherapy, despite the fact Medicaid regulations require that persons receiving such services have the capacity for insight oriented psychotherapy, and at the same time, used codes 90806 and 90808 to bill Medicaid and other federally funded programs for the same services twice.

69.     Relator/qui tam Plaintiff determined and informed the Defendants that this provider had used code 96101, a code used to bill for testing and reporting by a psychiatrist or medical doctor, to bill Medicaid for neurological assessments that had been performed by an administrative assistant who was not licensed or otherwise qualified to provide such services, and who was therefore not eligible to be reimbursed under Medicaid rules and regulations.

70.     The Defendants paid all of the above-referenced claims and obtained a profit by doing so.

71.     After the Relator/qui tam Plaintiff reported information regarding Ann Morrow's submission of false claims for payment to OHNM, to the State of New Mexico, and to her supervisor, both OHBS' SIU Director, Joseph Popillo, and SIU supervisor, Patricia LeFort, verbally reprimanded the Relator/qui tam Plaintiff for causing the State to investigate this provider.

72.     In addition, OHNM's CEO, Michael Evans met with Joseph Popillo about the Relator/qui tam Plaintiff's investigation of Ann Morrow.  After that meeting, Popillo admonished the Relator/qui tam Plaintiff's and told her that Defendant OHNM had been receiving letters from Morrow's attorneys and that Evans was "tired of taking heat" because of

the Relator/qui tam Plaintiff's investigation and reporting of Morrow's submission of false claims for payment to the Medicaid program to the State of New Mexico.

73.     Popillo and LeFort both informed the Relator/qui tam Plaintiff that, because of their discussions with Defendant OHNM's CEO, Michael Evans, they wanted the Relator/qui tam Plaintiff to stop investigating Morrow.

74.     The Defendants ignored the reports it had received regarding this provider, affirmatively misrepresented the evidence of this subcontractor's submission of false claims for services that had not been provided in order to minimize the significance of those practices, and failed to take any action to stop payment, recoup payments made to this subcontractor or to prevent it from continuing to submit false claims to the Medicaid and other federally funded programs.

75.     Defendant OHNM's CEO and Defendant OHBS' Special Investigations Unit manager admonished the Relator/qui tam Plaintiff for conducting her investigation of this provider, told her she did not have adequate documentation to support a request for a stop payment order she had requested from the State, and did not take any action to recoup payments made to this subcontractor or to prevent it from continuing to submit false claims to the Medicaid program.

76.     The amount of Medicaid and other federal and state funds paid to this provider in reimbursement of false claims is at least $320,000.00.  The Defendants received twenty-eight percent of the total amounts billed to its subcontractor in reimbursement of false claims.

**Claims Submitted by and on Behalf of Gerard Weideman dba Studio Best**

77.     Relator/qui tam Plaintiff incorporates by reference all preceding allegations as if

fully set forth herein.

78.    When the Defendants first began performing work under the contract with the State, the Defendants knew that Gerard Weideman dba Studio Best had billed Medicaid for services provided by unlicensed individuals and improperly licensed providers who were not eligible to be reimbursed under the Medicaid program, billed Medicaid for services that were not rendered, and had billed Medicaid for non-Medicaid covered expenses due to the fact that several employees of the previous Statewide Entity who had knowledge that these types of false claims had been submitted by this provider continued to work for the Defendants.

79.    In addition, Ingenix, a subsidiary of United Health Group, Inc., conducted an audit of this provider which concluded that OHNM should stop payment to this provider due to its submission of false claims for reimbursement.  Despite these findings and recommendations, OHNM did not report what had been identified as probable false billing to the state or other law enforcement officials or take any action to recoup payments made to this provider as a result of its submission of false claims for behavioral services.

80.    The Relator/qui tam Plaintiff determined and informed OHNM officials that this provider had submitted bills for providing group therapy to 20 to 40 child clients at a time and was submitting claims for payment to the Medicaid program for 15 to 20 hours a day of such services.  The State of New Mexico's rules and regulations set a limit of eight to twelve children in a group therapy context.  The Defendants never reported this information to the State or the federal government and never took any action to recoup payments made to this provider as a result of its submission of false claims.

81.    The Relator/qui tam Plaintiff determined and informed OHNM officials this

provider had submitted and was continuing to submit claims to Medicaid for mental health care and psychotherapy services when in fact no such services had been provided, and had billed Medicaid for these types of services when they had been provided by an unlicensed or otherwise qualified individual, and that those claims were therefore not eligible for reimbursement under the Medicaid program.

82.     Relator/qui tam Plaintiff determined and informed the Defendants that this provider worked three days per week yet, on average, billed Medicaid for twelve, thirty minute individual psychotherapy sessions under code 90804, twelve family psychotherapy sessions (without a client being present) under code 90846, 23 children in group therapy under code 90853, and 32 children in group interactive psychotherapy under code 90857 each day.  Such treatment, if actually provided, would take a minimum of 15 hours a day to provide.

83.     Relator/qui tam Plaintiff determined and informed the Defendants that this provider also submitted claims for payment to the Medicaid program under a code that was used to bill Medicaid for the provision of therapy to adults when this provider was actually providing interactive group therapy to children under the age of twelve. The code used by this provider paid more than the code which was supposed to be used to bill Medicaid for providing therapy to children, under the age of twelve who, according to applicable regulations, do not have the developmental capacity to participate in group therapy.

84.     The Relator/qui tam Plaintiff determined and informed the Defendants that this provider billed for providing therapy to clients three times a week which, under Medicaid regulations, is referred to as Intensive Outpatient Treatment, even though there was no documentation to support the claims that such intensive therapy had been provided or that such

therapy was medically necessary, and that this provider's billing practices violated NMAC 16.27.18(E) and 8.310.8.13.

85.     The Relator/qui tam Plaintiff requested OHBS' SIU supervisor to send a recoupment demand for the amount of the false claims submitted by this provider on four separate occasions.  OHNM refused to send such demands.

86.     The total amount of payments made by the Defendants to this provider in payment of false claims totals at least $203,000.  The Defendants received twenty-eight percent of the amounts paid to this provider in reimbursement of false claims.

**Claims Submitted by Carlsbad Mental Health Center.**

87.     Relator/qui tam Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

88.     For over a year between approximately July of 2010 and October of 2011, Defendant OHNM received multiple calls and at least one facsimile from employees and a manager of Carlsbad Mental Health Center (CMHC) on its fraud/abuse tipline reporting that this provider was directing its employees to submit claims for payment to Medicaid for one set of services that had not been provided, instead of billing for the services that had been provided because the payout to the provider was greater.

89.     Defendant OHNM did not respond to these calls or investigate these reports and continued to pay CMHC under the Medicaid program.

90.     When confronted with this fact by the Relator/qui tam Plaintiff, OHNM's COO informed the Relator/qui tam Plaintiff that no action had been taken because CMHC was "a big player in the state", that OHNM already had problems with the State because its claims edit

system, which was supposed to identify and prevent false billing did not work, and that OHNM did not want to draw attention to themselves by going after a big provider such as CMHC.

91.     In July of 2011, an employee of CMHC informed OHNM that she believed she had been fired for refusing to go along with the false claims being submitted by CMHC and asked OHNM to look into those practices.  Defendant OHNM took no action in response to this information.

92.     This employee and other CMHC employees reported to the Relator/qui tam Plaintiff that CMHC management instructed staff how to bill Medicaid in order to obtain the maximum amount of reimbursement, by billing for services provided to clients when clients were not present, and billing for the same service as if provided at two different locations at the same time.

93.     Relator/qui tam Plaintiff discovered that CMHC had been double billing for the same services by submitting bills for the same services to the Medicaid program and the Behavioral Health Services Division of NMDOH, that CMHC had billed for providing eight hours of services to clients when CMHC's documentation showed those clients were only present for five hours, that patient documentation did not support the claims being submitted by CMHC, and that CMHC was improperly billing for behavioral health services that were being provided by van drivers and other persons not qualified or licensed to provide those services and who were therefore ineligible to receive reimbursement under the Medicaid program.

94.     Relator/qui tam Plaintiff informed Defendant OHNM's COO, Marilyn Van Horn and OHBS' SIU Director, Joseph Popillo, of these practices.  Popillo then met with Defendant OHNM's COO, Van Horn, and CFO, Susan Vogel, about Relator /qui tam Plaintiff 's findings.

95.     Popillo subsequently told the Relator/qui tam Plaintiff to stop her investigation of CMHC, and was told not to irritate the CEO of CMHC by uncovering false claims because he was politically connected and doing so would cause problems for OHNM.  OHNM's COO admitted she was aware CMHC was submitting false claim but that OHNM could not go against CMHC because it would cause problems for OHNM with the State of New Mexico, and instructed the Relator/qui tam Plaintiff not to talk to anyone with the State. Relator/qui tam Plaintiff did not follow these instructions and instead notified personnel at NMHSD.

96.     Defendant OHNM refused to stop payments to CMHC, and when NMHSD announced its intention to stop payment to this contractor, OHNM officials intervened and falsely told HSD that its clients would be adversely affected if CMHC did not continue to receive payment.  As a direct result of the Defendants' intervention and false statements, HSD did not implement the stop payment order from taking effect.

97.     The Relator/qui tam Plaintiff was then contacted by a representative of the New Mexico Attorney General's office who wanted to speak with the Relator/qui tam Plaintiff about CMHC and was ordered by Defendant OHBS' SIU Supervisor, Patricia LeFort, and OHBS' Director, Joseph Popillo, not to respond to the AG's requests for information and assistance.

98.     The Relator/qui tam Plaintiff was subsequently told by OHNM"s Compliance Director, Richard Strauss, that he had read a copy of the Relator /qui tam Plaintiff 's report on CMHC and that it said the Relator/qui tam Plaintiff did not think false claims were being submitted by this provider. In fact, the Relator/qui tam Plaintiff's report made no such statements and had requested the New Mexico Attorney General's office to investigate CMHC's false claims.

99.     Defendant OHBS' SIU Director, Joseph Popillo, and the supervisor of that unit, Patricia LeFort, had electronic access to the Relator/qui tam Plaintiff's report and thus had the ability to alter the contents of that report.

100.     The Defendants took no action to stop payment to this provider, recoup payments previously made to this provider in reimbursement of false claims submitted by CMHC, and did not advise the State of any of the facts it was aware of showing that CMHC had submitted false claims to the Medicaid program.

101.     The total amount of payments made to CMHC in reimbursement of false claims totals at least $9.56 million. The Defendants received twenty-eight percent of all amounts paid to this provider in reimbursement of false claims.

### Claims Submitted by New Mexico Psychiatric Services

102.     Relator/qui tam Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

103.     At least as early as October, 2010, Defendants received reports on OHNM's fraud and abuse tipline that New Mexico Psychiatric Services Corporation (NMPS) was submitting false claims for reimbursement under the Medicaid program.

104.     Upon information and belief, Defendant OHNM did not respond or take any action in response to these reports for more than a year until December 2011, when the Relator/qui tam Plaintiff initiated an investigation of this provider.

105.     The Relator/qui tam Plaintiff's investigation revealed that NMPS, had been billing for medication management for drugs that had been prescribed by a secretary who was not authorized, qualified or licensed to prescribe medicine, and whose services were therefore

not eligible for reimbursement under the Medicaid program.

106.     Relator/qui tam Plaintiff also discovered and informed the Defendants that NMPS' records showed that NMPS had billed Medicaid for providing 30 to 90 minutes of psychotherapeutic treatment to 20 to 30 patients a day, and claimed that one provider saw that number of patients each day.

107.     Despite the impossibility of NMPS having provided the services it was claiming reimbursement for, Defendant OHNM paid NMPS' claims which, in some cases, sought reimbursement for 24 to 30 hours a day of treatment provided by a single provider.

108.     Several psychotherapy billing codes used by NMPS including code 90847, are time dependent, meaning that the person providing the services was required to spend a certain amount of time with a patient in order to be eligible to be reimbursed under the Medicaid program.  Claims submitted under code 90847 require that one hour of psychotherapy services be provided in order for a provider to be eligible for reimbursement under the Medicaid program.

109.     Relator/qui tam Plaintiff's investigation of NMPS determined that NMPS did not have documentation in its patient files supporting NMPS' claims it had provided one hour of psychotherapy which this provider had billed for under code 90847, that its only licensed psychotherapist in the Albuquerque office was not providing psychotherapeutic services, and that NMPS was submitting claims for reimbursement for such services through the Medicaid program.  Defendant OHNM paid these claims.

110.     Relator/qui tam Plaintiff's investigation of NMPS' Roswell office determined that NMPS was billing Medicaid for medication management and family psychotherapy for all of its clients who were children, and that NMPS did not maintain documentation which supported its

claims that it was providing psychotherapy to these child patients. Defendant OHNM paid these claims.

111.    Relator/qui tam Plaintiff's investigation further determined that NMPS was billing for services allegedly provided by Dr. Babak Mirin, that Dr. Mirin did not actually see or provide services to patients, that NMPS had billed Medicaid for services allegedly provided by Dr. Mirin in different parts of the state and that the services NMPS had billed for had actually been provided by other providers in violation of NMAC 16.27.18.18. Defendant OHNM paid these claims.

112.    NMPS also falsely billed Medicaid prior to December 7, 2011, for at least $1,187,366.10, when it submitted claims for reimbursement for services even though it did not have a credentialed psychotherapist at any of its facilities and was therefore, ineligible to bill Medicaid for providing psychotherapy to Medicaid clients.  Relator/qui tam Plaintiff also determined that NMPS was billing for these services under Dr. Babak Mirin's name when those services, according to an NMPS employee, had actually been provided by two, unlicensed graduate students in violation of NMAC 8.310.8.16 which prohibits a Medicaid provider from billing for services rendered by someone other than himself, and NMAC 16.27.18.19 which prohibits a Medicaid provider from delegating professional responsibilities to unqualified persons.

113.    Despite being told of all of these findings, Defendant OHNM took no action to stop paying this provider, or to recoup payments made in reimbursement of false claims, and kept the profit generated by it having paid those false claims.  The Defendants received twenty-eight percent of all amounts paid to this provider as reimbursement for false claims.

114.    OHBS' SIU Director, Joseph Popillo, ordered the Relator/qui tam Plaintiff to "not have any conversations" about any of her audits or investigation of this provider with OHNM employees despite the fact that the Relator/qui tam Plaintiff  had conducted her investigations of this provider in conjunction with OHNM personnel from OHNM's Quality Improvement and Provider Relations units.

115.    OHBS' Popillo further informed the Relator/qui tam Plaintiff that he had met with Defendant OHNM'S CEO, Michael Evans, and that Evans had agreed with Popillo that the Relator/qui tam Plaintiff was not to coordinate her investigations with or have conversations with OHNM's Compliance Director or other employees about those investigations.   Upon information and belief, such practice was contrary to what Defendant OHNM's practice had been prior to the arrival of Popillo.

## Claims Submitted by Covenant Child

116.    Relator/qui tam Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

117.    Defendant OHNM's COO and CFO asked the Relator/qui tam Plaintiff to investigate Covenant Child, Inc. (hereinafter Covenant), a subcontractor provider of behavioral health services.

118.    Covenant was a small volume provider which provided behavioral health services in Roswell, New Mexico.

119.    Relator/qui tam Plaintiff determined Covenant had been billing Medicaid for services provided by a medical doctor when in fact it did not have a medical doctor at its facility and had used improper billing codes which resulted in Covenant receiving more money that it

was entitled to receive.

120. Defendant OHNM had paid and continued to pay these claims despite the fact its edit system should have identified these billings as being suspect and warranting further investigation.

121. Relator/qui tam Plaintiff advised Defendant OHNM's COO that Covenant was willing to pay OHNM back the difference between what Covenant should have received as reimbursement under the correct codes, and what it actually received using the wrong codes, for all bills it had submitted under improper codes, a total of approximately $86,000.

122. Relator/qui tam Plaintiff was instructed by OHNM's COO not to report this finding to the State of New Mexico because if these claims were reported, the State would learn that OHNM's edit system did not work properly.

123. Defendant OHNM made no effort to stop payments to this provider through April of 2012, and made no effort to recoup Medicaid funds it had improperly paid to this provider.

124. The total amount of false claims submitted by this provider was approximately $86,000.00.

**Claims Submitted by Dr. Cynthia King**

125. Relator/qui tam Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

126. Dr. Cynthia King (hereinafter "King") was a provider of behavioral services in the Albuquerque area.

127. The Business Operations Unit of Defendant OHNM did an analysis of facilities in New Mexico for the purpose of identifying those facilities that over utilized code 90801- the

code used to bill Medicaid for the initial evaluation of a patient which takes at least sixty minutes and which, under Medicaid rules may only be used one time per year per patient.

128. Defendant OHNM identified King as a provider which over utilized this code because OHNM's analysis revealed King had used this code more than twenty times for individual clients.

129. Relator/qui tam Plaintiff also discovered and reported to Defendant OHNM that King was using a high level, high paying code which can only be used to bill for an intensive three hour monitoring and assessment of patients, that her office's documentation did not support claims under such codes, and that the services that had been provided and billed under Dr. King's name had actually been provided by social workers in violation of Medicaid rules and regulations including: (a) NMAC 8.310.8.16 which prohibits billing Medicaid for services rendered by anyone other than the actual provider; (b) NMAC 16.27.18.18 (Q)(1) which requires that the identity of the actual provider be used on billing documents; and (c)NMAC 16.27.18.19 which prohibits a licensed professional from delegating professional responsibilities to unqualified persons.

130. Relator/qui tam Plaintiff also discovered and informed the Defendants that King diagnosed all of her clients as having autism even though other licensed mental health workers did not reach the same diagnosis.

131. Under Medicaid rules and regulations, a diagnosis of autism permits the provider to bill for services under both medical and mental health billing codes.

132. Relator/qui tam Plaintiff's investigation determined that King's diagnoses of autism was used to support her billing for the same services under both medical and mental

health codes and her use of billing codes which paid more than the amounts King was entitled to receive in violation of Medicaid rules and regulations including NMAC 16.27.18.18.

133.   Despite being told of these findings Defendant OHNM made no effort to stop payment to this provider or to recoup amounts it had paid to King in reimbursement of false claims submitted to it by King.

134.   The total amount of Medicaid funds paid by Defendant OHNM to King in reimbursement of false claims totals at least $100,000.  The Defendants received twenty-eight percent of all amounts paid to the contractor in reimbursement of false claims.

**Claims Submitted by Southwest Counseling Center**

135.   Relator/qui tam Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

136.   At all material times Southwest Counseling Center, Inc., (hereinafter "SCC") was a large volume provider of behavioral health services in the Las Cruces area.

137.   When OHNM first entered into the contract with the Collaborative, it could not process claims for payments submitted to it by its subcontractors because of chronic, systemic failures in its claims processing system.  As a consequence, Defendant OHNM pre-paid several of its larger volume contractors lump sums which were to be used by the providers to cover claims they submitted to Defendants which had not yet been processed.

138.   SCC received a pre-payment of several million dollars from Defendant OHNM to cover payment of services it had already provided and would be providing in the future.

139.   Defendant OHNM's COO and CFO informed the Relator/qui tam Plaintiff that SCC had been overpaid in the amount of at least $1.7 million dollars and that OHNM believed

SCC had submitted false documents to support its claims for payment under the Medicaid program, but that OHNM did not have the resources to address these false claims.

140.     Due to the fact Defendant OHNM's SIU was unable to access SCC's billing data maintained on OHNM's computer server,  Relator/qui tam Plaintiff's investigation and audit of SCC  was unable to be completed.

141.     Relator/qui tam Plaintiff was told by Defendant OHNM's COO "not to worry" about the fact that she was unable to complete her investigation of this provider because of incomplete data.

142.     Upon information and belief, SCC submitted false claims for payment to the Medicaid program totaling approximately $1.7 million dollars.

143.     Defendant OHNM paid those claims and received twenty eight percent of the amount paid to SCC in reimbursement of false claims submitted by SCC.

**Claims Submitted by Presbyterian Medical Services**

144.     Relator/qui tam Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

145.     Presbyterian Medical Services, Inc. (hereinafter "PMS") was at all material times a large volume provider of behavioral health services in northwestern New Mexico.

146.     On and before February 23, 2012, Defendant OHNM received several complaints about this provider from the New Mexico Children Youth and Families Department, and state juvenile probation officers, and from calls to its fraud and abuse tipline by employees of PMS regarding inadequate treatment and abuse of patients at PMS facilities in Farmington, New Mexico.

147.    These reports and complaints included reports that PMS was unlawfully discharging patients from its facilities, and keeping Medicaid patients in the facility for much longer periods of time than was clinically warranted or medically necessary in violation of Medicaid rules including NMAC 16.27.18.18.

148.    Defendant OHNM did not refer this information to State investigators for prolonged periods of time in violation of its contract with the State and Medicaid rules and regulations.

149.    By no later than February 26, 2012, Relator/qui tam Plaintiff forwarded the PMS's employees' complaints to the New Mexico Attorney General's Office, Medicaid Fraud Division, and began an investigation of those reports.

150.    On March 27, 2012, Relator/qui tam Plaintiff traveled to Farmington, New Mexico, to conduct an investigation of this provider.  Relator/qui tam Plaintiff returned to Albuquerque on March 29, 2012, and provided the information she had discovered as a result of her investigation to Defendant OHNM's Supervisor of Quality Improvement, Tracy Townsend.

151.    Immediately after the Relator/qui tam Plaintiff returned from visiting PMS' Farmington office, Defendant OHNM's Vice President Elizabeth Martin and Supervisor of Quality Improvement Tracy Townsend visited PMS' Farmington offices.

152.    Relator/qui tam Plaintiff's investigation determined that Defendant OHNM's Utilization Specialist who had approved the extension of stays for Medicaid patients being served by PMS, had been instructed by Defendant OHNM's management to approve all stays for PMS Farmington because PMS' payout from OHNM was lower than the state average and because OHNM wanted this provider, which OHNM knew was having financial problems, to

remain in business.

153.     Relator/qui tam Plaintiff's investigation of this provider determined that PMS' documentation was insufficient to support its claims for payment under the Medicaid program in violation of Medicaid rules including NMAC 8.302.1.17 and 42 C.F.R. §431.107(b).

154.     Relator/qui tam Plaintiff's investigation further determined that PMS had destroyed social worker notes documenting that sexual abuse of clients was on going at this facility, rewrote them to delete all references to such abuse, and that personnel at PMS' Farmington office were not trained as required by law and were therefore ineligible to bill under the Medicaid program.

155.     Relator/qui tam Plaintiff's investigation also determined that PMS had falsified billing time sheets used to support billings submitted to the Medicaid program records.

156.     On March 30, 2012, three days after Relator/qui tam Plaintiff had gone to Farmington and initiated her investigation of PMS, Relator/qui tam Plaintiff was informed by Defendant OHBS' SIU Director that she was under investigation, to stop work on her investigation of this provider, and to not speak with anyone regarding her investigation. Relator/qui tam Plaintiff was further informed that if she did speak with anyone about PMS she would be fired by OHNM.

157.     In April of 2012, OHBS' SIU Director and Supervisor, Popillo and LeFort told the Relator/qui tam Plaintiff that they were in communication with Defendant OHNM officials and that those officials were displeased with the Relator/qui tam Plaintiff's investigation of PMS.

158.     In the first week of April 2012, after OHNM received calls from the New Mexico Attorney General's Office regarding PMS. OHBS' SIU Director, Popillo, instructed the

Relator/qui tam Plaintiff not to return those calls or talk to anyone about PMS, or the Relator/qui tam Plaintiff's investigation of PMS, and to stop her investigation of PMS.

159.    The following Monday, April 9, 2012, Relator/qui tam Plaintiff's employment was terminated.

160.    The total amount of Medicaid funds paid to this subcontractor in reimbursement of false claims was at least $350,000.  The Defendants received twenty-eight percent of all amounts paid to the contractor in reimbursement of false claims.

### Certifications by the Defendants

161.    Relator/qui tam Plaintiff incorporates by reference all preceding allegations as of fully set forth herein.

162.    At all material times, the Defendants were required to make certifications to the State and federal governments regarding their and their subcontractors' compliance with the rules and regulations governing the Medicaid program.

163.    The Defendants' certifications of compliance with the rules and regulations governing the Medicaid program were a condition precedent to the Defendants receiving Medicaid funds under its contract with the Collaborative.

164.    Throughout the term of the Defendants' contract with the Collaborative, the Defendants falsely certified that, among other things:

      a.    all of its employees, and all of the employees of its subcontractors, specifically including those subcontractors identified in this Complaint, were licensed and otherwise qualified to provide the services being billed for, and thus eligible for reimbursement under the Medicaid program was sought;

b.      the Defendants had a functional edit system in place which was capable of identifying claims that were not eligible for Medicaid reimbursement and claims that were suspicious and required additional scrutiny before reimbursement would be paid to the provider submitting such claims;

c.      all claims submitted by the Defendants were accurate and within Medicaid and federal grant guidelines; and

d.      all claims accurately reflected the care actually provided.

165.    Throughout the term of their contract with the Collaborative, the Defendants knew that their edit system was not functional or working properly.

166.    The Director of Defendant OHBS's SIU affirmatively instructed the Relator/qui tam Plaintiff not to communicate with OHNM's Compliance Director, the only one who was permitted to report fraud or suspected fraud under State rules, regarding the non-functional status of Defendants' edit system.

167.    The Defendants would not have been eligible to receive any Medicaid, federal grant funds, or State funds under their contract with the Collaborative if they had not falsely certified that their edit system was functional.

168.    The Defendants' maintenance of a non-functional edit system resulted in the submission of false claims for reimbursement under the Medicaid program and under other programs funded by federal grant monies.

**Count I - Federal False Claims Act Violations**

169.    Relator/qui tam Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

170.    Relator/qui tam Plaintiff brings this count of her Complaint pursuant to 31 U.S.C. §3729(a)(1)(A) and (B).

171.    At all relevant times, Defendants "knew", within the meaning of the False Claims Act, the claims submitted by its subcontractors which are identified in the preceding paragraphs of this Complaint were false within the meaning of the False Claims Act, and that the subcontractors were not entitled to be reimbursed for the services they billed for under the Medicaid program or the other federally and state funded programs which provided funds used to pay for the provision of behavioral health services to New Mexico residents under the Defendants' contract with the Collaborative.

172.    Despite knowing of the falsity of those claims, the Defendants accepted, processed and paid those claims from Medicaid funds and funds obtained from other government funding sources.

173.    Defendant OHNM received twenty eight percent of every claim it paid to its subcontractors.

174.    No public disclosure of the information contained in this Complaint has occurred.

175.    The United States, upon presentation of each such claim for payment, whether directly or indirectly, remitted payment despite the falsity of those claims and the ineligibility of Defendants and their subcontractors to qualify for such payments, and therefore suffered damage.

176.    Relator/qui tam Plaintiff is an original source of the information set forth above and has direct and independent knowledge of the allegations and transactions giving rise to the allegations in this Complaint regarding these Defendants' failure to satisfy their conditions of

participation in the Medicaid and Medicare program and their presentment of false claims for payment and approval.

177.    The above-described actions and omissions of the Defendants and their presentment of false claims for payment constitute violations of 31 U.S.C. §3729(a)(1)(A) and (B) and directly and proximately caused the United States government to suffer damages in an undetermined amount.

178.    Pursuant to 31 U.S.C. §3729(a), the Defendants are liable for three times the amount of all sums paid to the Defendants by the United States as a result of the false claims and certifications submitted to the United States by the Defendants, mandatory civil penalties of no less than $5,500 and no more than $11,000 for each false claim and certification submitted to the United States, and pre and post judgment interest which attaches to such amounts.

179.    Relator/qui tam Plaintiff, who has brought this action on behalf of the United States and herself pursuant to 31 U.S.C. §3739(b), is entitled under 31 U.S.C. §3730(d) to an award of not less than fifteen and not more than thirty percent of the amounts recovered as a result of bringing this action, an award of reasonable attorney's fees and costs incurred in bringing this action, and to reasonable expenses which this Court finds to have been necessarily incurred.

WHEREFORE, Relator/qui tam Plaintiff prays that judgment be entered in Plaintiff and Relator/qui tam Plaintiff's favor and against all Defendants, awarding the Plaintiff United States three times the amount of all sums paid by the United States of America as a result of the Defendants' violations of the False Claims Act, mandatory statutory penalties of not less than $11,000 for each false claim submitted by the Defendants, pre and post judgment interest,

awarding the Relator/qui tam Plaintiff on her own behalf twenty five percent of all amounts recovered under the claims as to which the United States has intervened and thirty percent of all amounts recovered under the claims as to which the United States has not intervened, reasonable attorneys' fees and costs, an award of reasonable expenses which the Court finds to have been necessarily incurred by the Relator/qui tam Plaintiff in bringing this action and awarding any other and further relief as the Court deems just and proper.

## COUNT II - Federal False Claims Act Violations

180.    Relator/qui tam Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

181.    The Defendants presented false claims to the federal and state government when they falsely certified that they and all of their subcontractors were in compliance with Medicaid and federal grant guidelines and that its edit system was functional and working properly.

182.    The Defendants' false certifications resulted in them receiving quarterly allotments of funds through the Medicaid and other State and federally funded programs.

183.    From October 1, 2011 through the date of the filing of this Complaint, Defendants received approximately $529.5 million dollars in quarterly allotments which the Defendants used to pay claims submitted by its subcontractors.

184.    The Defendants received twenty eight percent of every claim they paid using those funds.

185.    From the October 1, 2011, until the present, the Defendants received a total of approximately $529.5 million dollars as a direct and proximate result of their false certifications. Defendants retained twenty eight percent of that amount as compensation under the contract with

the Collaborative.

186. The Defendants' presentment of false certifications of compliance with Medicaid rules, regulations and guidelines in order to obtain the payment of money from that and other federal and state funded programs constituted the presentment of false claims to the United States government and a violation of 31 U.S.C. §3729(a)(1)(2) and (3).

WHEREFORE, Relator/qui tam Plaintiff prays that judgment be entered in Plaintiff, United States, and Relator/qui tam Plaintiff's favor and against all Defendants, awarding the Plaintiff United States three times the amount of all sums paid by the United States of America to Defendant OHNM as a result of the Defendants' violations of the False Claims Act, mandatory statutory penalties of not less than $11,000 for each false claim submitted by the Defendants, pre and post judgment interest, awarding the Relator/qui tam Plaintiff on her own behalf twenty five percent of all amounts recovered under the claims as to which the United States has intervened and thirty percent of all amounts recovered under the claims as to which the United States has not intervened, reasonable attorneys' fees and costs, and reasonable expenses which the Court finds to have been necessarily incurred by the Relator/qui tam Plaintiff in bringing this action and awarding such other and further relief as the Court deems just and proper.

## COUNT III - Conspiracy to Submit False Claims

187. Relator/qui tam Plaintiff incorporates by reference all preceding allegations including but not limited to those in paragraphs 57, 59, 71, 72, 73, 75, 94, 95, 96, 97, 114, 115, 122, 151, 156, 157, 158, 165 and 166 of this Complaint as if fully set forth herein.

188. Defendant UnitedHealth Group, Inc., and Defendants UnitedHealth Insurance

Company and United Behavioral Health Inc., d/b/a OptumHealth New Mexico (hereinafter collectively referred to as OHNM) conspired to present or cause to be presented false claims for payment or approval, and to use or cause to be used false records or statements material to a false or fraudulent claim in order to obtain payment from the Medicaid program and other state and federal governmental funding sources.

189.    More specifically, Defendant OHNM's COO and Regional Director conspired with United Health Group, Inc.'s  OHBS' SIU director and supervisor to ignore and take no action to investigate reports that OHNM's subcontractor, Family Connections, was submitting false claims to the Medicaid program and dissuade the Relator/qui tam Plaintiff from continuing her investigation into the submission of false claims by this provider in an effort to allow Family Connections to continue to submit false claims to obtain reimbursement from the Medicaid program and enable the Defendants to receive twenty eight percent pursuant of every claim paid to this provider.

190.    Defendant OHNM's CEO, COO and CFO, and UnitedHealth Group, Inc.'s OHBS' SIU supervisor, LeFort, conspired to disregard multiple reports that its subcontractor Ann Morrow had submitted false claims for reimbursement, to limit the Relator /qui tam Plaintiff's ability to investigate the submission of false claims by this provider, and thus to continue to allow Ann Morrow to submit false claims to, and obtain reimbursement from, the Medicaid program by requiring the Relator/qui tam Plaintiff to use a knowingly incomplete and inaccurate data base generated by Defendant OHNM, thus enabling the Defendants to receive twenty eight percent of every claim paid to this provider.

191.    Defendant UnitedHealth Group Inc.'s OHBS' SIU Director and its SIU supervisor

conspired with Defendant OHNM's COO to conceal the submission of false claims by OHNM's subcontractor CMHC by instructing the Relator/qui tam Plaintiff to stop her investigation of this provider and to not respond to requests for information about this providers submission of false claims from the New Mexico Attorney General's office in order to allow this provider to continue to submit false claims to and obtain reimbursement from the Medicaid program and enable the Defendants to receive twenty eight percent of every claim paid to this provider.

192.    Defendant OHBS' SIU Director and its SIU supervisor conspired with Defendant OHNM's Vice President, Elizabeth Martin, to stop the Relator/qui tam Plaintiff's investigation of the submission of false claims for Medicaid reimbursement by Defendant OHNM's subcontractor, Presbyterian Medical Services, by placing the Relator/qui tam Plaintiff under investigation for pretextual reasons, ordering her not to work on her investigation of PMS while she was under investigation,  ordering her not to speak with anyone about her investigation of this provider, and then terminating her employment in order to allow the provider to continue to submit false claims to, and obtain reimbursement from, the Medicaid program and to enable the Defendants to receive twenty eight percent of every claim paid to this provider.

193.    As a direct result of these Defendants' actions, the Defendants and the above-identified providers submitted and continued to submit false claims for reimbursement to the Medicaid program and other federal and state government funded programs and to obtain reimbursement from those programs.

194.    The above-described acts constitute violations of 31 U.S.C. §3729(a)(1)(c)and caused the United States of America to be damaged in an amount to be determined at trial.

WHEREFORE, Relator/qui tam Plaintiff prays that judgment be entered in Plaintiff and

Relator/qui tam Plaintiff's favor and against all Defendants, awarding the Plaintiff United States three times the amount of all sums paid by the United States of America as a result of the Defendants' violations of the False Claims Act, mandatory statutory penalties of not less than $11,000 for each false claim submitted by the Defendants, pre and post judgment interest, awarding the Relator/qui tam Plaintiff on her own behalf twenty five percent of all amounts recovered under the claims as to which the United States has intervened and thirty percent of all amounts recovered under the claims as to which the United States has not intervened, reasonable attorneys' fees and costs, and reasonable expenses which the Court finds to have been necessarily incurred by the Relator/qui tam Plaintiff in bringing this action and awarding such other and further relief as the Court deems just and proper.

### COUNT III - Violations of New Mexico's Fraud Against Taxpayers Act

195.     Relator/qui tam Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

196.     At all relevant times, Defendants "knew", within the meaning of the Fraud Against Taxpayers Act, §44-9-1 et seq. NMSA 2007, that the claims submitted by its subcontractors which are identified in the preceding paragraphs of this Complaint were false within the meaning of the  Fraud Against Taxpayers Act, and that it and its subcontractors were not entitled to be reimbursed for the services they billed for under the Medicaid program and the other federally and state funded programs which provided funds used to pay for the provision of behavioral health services to New Mexico residents under the Defendants' contract with the Collaborative.

197.     Despite knowing of the falsity of those claims, the Defendants accepted,

processed and paid those claims from Medicaid funds and funds obtained from other government funding sources.

198.    The State of New Mexico, through the Collaborative, upon presentation of each such claim for payment, whether directly or indirectly, remitted payment despite the false claims and failure of Defendants and their subcontractors to qualify for such payments, and therefore suffered damage.

199.    The Defendants' presentment of false certification of compliance with Medicaid rules, regulations and guidelines constituted the presentment of false claims to the State of New Mexico and a violation of §44-9-3.A(1), (2), (3).

200.    The above-described actions and omissions of the Defendants and their presentment of false claims for payment directly and proximately caused the government of the State of New Mexico to suffer damages in an undetermined amount.

201.    Pursuant to §44-9-3 NMSA 2007, the Defendants are liable for three times the amount of all sums paid to the Defendants by the State of New Mexico as a result of the false claims and certifications submitted to it by the Defendants, mandatory civil penalties of no less than $5,000 and no more than $10,000 for each false claim and certification submitted to the State of New Mexico, and pre and post judgment interest which attaches to such amounts.

202.    Relator/qui tam Plaintiff, who has brought this action on behalf of the State of New Mexico and herself pursuant to §44-9-5 NMSA 2007, is entitled under §§44-9-3 and 7 NMSA 2007 to an award of not less than fifteen and not more than thirty percent of the amounts recovered as a result of bringing this action, an award of reasonable attorney's fees, and the costs of this action.

WHEREFORE, Relator/qui tam Plaintiff prays that judgment be entered in Plaintiff and Relator/qui tam Plaintiff's favor and against all Defendants, awarding the Plaintiff State of New Mexico three times the amount of all sums paid by the State of New Mexico as a result of the Defendants' violations of the Fraud Against Taxpayers Act, pre and post judgment interest, mandatory statutory penalties of not less than $5,000 and not more than $10,000 for each false claim submitted by the Defendants, awarding the Relator/qui tam Plaintiff on her own behalf twenty five percent of all amounts recovered under the claims as to which the State of New Mexico has intervened and thirty percent of all amounts recovered under the claims as to which the State has not intervened, reasonable attorneys' fees, and costs of bringing this action and awarding any other and further relief as the Court deems just and proper.

## COUNT IV - WHISTLEBLOWER RETALIATION

203.     Clark incorporates by reference all preceding allegations as if fully set forth herein.

204.     Clark brings this claim against Defendant UnitedHealth Group, Inc. pursuant to §44-9-11 NMSA 2007.

205.     At all material times, Clark was employed by Defendant United Health Group, Inc., and was assigned to UnitedHealth Group Inc.'s Optum Behavioral Solution.

206.     Clark worked as Senior Investigator and was responsible for investigating reports and suspicions of fraud and abuse that arose in the course of Defendants United Healthcare Insurance Company, United Behavioral Health, Inc., and OptumHealth New Mexico's performance of its contract with the Collaborative.

207.     In the course of her employment, Clark disclosed information to the New Mexico

-48-

State government and law enforcement officials regarding the submission of false claims to the Medicaid and other federally and state funded programs by the Defendants and their subcontractors.

208.    In retaliation for Clark reporting suspected fraud and abuse on the part of the Defendants and their subcontractors with regard to the submission of false claims to the Medicaid and other federally and state funded programs, Defendant UnitedHealth Groups, Inc., threatened and harassed Clark, and then terminated  Clark's employment.

209.    Clark was damaged as a proximate result of the Defendant's retaliatory actions and has lost wages and benefits and has incurred special damages. Clark is entitled to an award of compensatory damages in an amount to be determined by the finder of fact including but not limited to an award of double back pay.

210.    The retaliatory actions of Defendant were willful, wanton and in reckless disregard of Clark's rights entitling her to an award of punitive damages in an amount to be determined by the finder of fact.

WHEREFORE, Relator/qui tam, Plaintiff Karen Clark prays that judgment be entered in her favor against Defendant UnitedHealth Group, Inc., awarding her double back pay plus interest, compensation for all special damages incurred by the Relator/qui tam Plaintiff as a result of her termination, punitive damages, reasonable attorney fees, pre and post judgment interest, and litigation costs incurred by her in bringing this action and any other further relief as the Court deems just and proper.

Respectfully submitted,

SANDERS & WESTBROOK, PC

_____

Duff Westbrook
Maureen Sanders
102 Granite Ave. NW
Albuquerque, NM 87102
(505) 243-2243