**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

KAREN CLARK,

Plaintiff,

vs.                                                                       No. 1:13-cv-00372/MV-CG
                                                                          JURY DEMANDED

UNITEDHEALTH GROUP, INC., and
UNITEDHEALTHCARE SERVICES, INC.

      Defendants.

## FIRST AMENDED COMPLAINT FOR VIOLATION OF §44-9-11 NMSA AND RETALIATORY DISCHARGE

Plaintiff, Karen Clark, pursuant to §44-9-11 of the New Mexico Fraud Against Taxpayers Act, §44-9-1 *et seq*. NMSA 2007 and New Mexico common law for her First Amended Complaint states:

1.     This is an action for compensatory, special and punitive damages arising from the termination of the Plaintiff's employment with Defendants UnitedHealthcare Services, Inc. and UnitedHealth Group, Inc.

2.     Plaintiff is currently a resident of the State of Alabama and, at the time the events giving rise to her Complaint occurred, was a resident of the State of New Mexico.

3.     Defendant UnitedHealth Group, Inc., (UHG) is a Minnesota corporation engaged in the business of providing managed health care through various subsidiaries, operating companies, agents, and joint ventures including Defendant UnitedHealthcare Services, Inc. (UHS), and United Healthcare Insurance Company (UHIC), United Behavioral Health (UBH), and OptumHealth New Mexico (OHNM).

4. Defendant UnitedHealthcare Services, Inc., (UHS) is a Minnesota corporation and a subsidiary of Defendant UHG that is engaged in the business of providing managed health care services.

5. The events giving rise to the Plaintiff's claims occurred in the State of New Mexico.

6. The amount in controversy exceeds $75,000 exclusive of interest and costs.

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.

8. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because the acts alleged in this complaint occurred in the District of New Mexico.

## ALLEGATIONS COMMON TO ALL CLAIMS

9. UBH, UHIC, OHNM, and Defendant UHS and each of their employees, including but not limited to OHNM CEOs Michael Evans and Elizabeth Martin, OHNM's COO Marilyn Van Horn, OHNM's CFO Susan Vogel, OHNM's Regional Director Pam Valencia, OHNM Provider Representative Jeffrey Danninger, the Director of the Special Investigations Unit, Joseph Popillo, the Manager of the Special Investigations Unit, Patricia LeFort, SIU investigator Tracy Hunt, OHNM's Compliance Director, Richard Strauss, OHNM's Supervisor of Quality Improvement Tracy Townsend, and OHNM's Quality Improvement Specialist Joseph Orduna, were at all times agents of Defendants.

10. Between January 22, 2009, and the present, OHNM had a contract (hereinafter "the contract") with the State of New Mexico Interagency Behavioral Health Purchasing Collaborative (hereinafter "Collaborative") pursuant to which they were obligated to provide behavioral health services to New Mexico residents.

11.     At all relevant times, OHNM provided behavioral health services to New Mexico residents under the contract through subcontractors located throughout New Mexico which provided behavioral health services to, among others, Medicaid beneficiaries. Those subcontractors included, but are not limited to:

(a)     Family Connections, which had a medical facility located at 103 Holtz Drive, Grants, New Mexico, 87020;

(b)     Ann Morrow & Associates, which had a medical facility located at 6666 4th Street Northwest, Los Ranchos, New Mexico 87107;

(c)     Gerard Weideman dba Studio Best, which had a medical facility located at 2977 Mesilla Hills Drive, Las Cruces, New Mexico, 88005;

(d)     Carlsbad Mental Health Center, which had a medical facility located at 914 North Canal Street, Carlsbad, New Mexico 88220;

(e)     New Mexico Psychiatric Services, which had medical facilities located at 1700 North Union Avenue, Roswell, New Mexico 88201; 502 West Bronson Street, Carlsbad, New Mexico 88220, and in Artesia, Portales and Albuquerque, New Mexico;

(f)     Covenant Child, Inc., which had medical a facility located at 100 South Kentucky Ave, Roswell, New Mexico 88203;

(g)     Dr. Cynthia King, which had a medical practice located at 2211 Lomas Boulevard Northeast, Albuquerque, New Mexico 87106;

(h)     Southwest Counseling Center, which had a medical facility located at 100 West Griggs Avenue, Las Cruces, New Mexico 88001; and

(i)      Presbyterian Medical System - Residential Treatment Center for Juveniles, which had a medical facility located at 851 Andrea Drive Suite 4, Farmington, New Mexico 87401.

12.      At all relevant times, OHNM received, processed and approved billings and claims for payment submitted by and received from these nine providers, as well as other subcontractor service behavioral health subcontractor providers and submitted those claims for payment to the Medicaid program and other programs funded by the federal and state government, and knowingly accepted and approved of their subcontractors' receipt of Medicaid and other government funds.

13.      From October 10, 2011, through April 9, 2012, Clark was employed as an at will employee by Defendants as a Senior Investigator and was assigned to the Defendants' Special Investigations Unit (SIU) division.

14.      At the time of Plaintiff's employment with Defendants, the SIU conducted investigations of allegations of fraud and abuse for and on behalf of OHNM.

15.      Plaintiff's job required her to investigate, and report suspected fraud, waste and abuse and potential violations of the False Claims Act (FCA), 31 U.S.C. §3729, *et seq.*, and the New Mexico Fraud Against Taxpayers Act (FATA), NMSA 1978 § 44-9-1, *et seq.*, on the part of subcontractor behavioral health service providers.

16.      Throughout her employment, and prior to the termination of her employment, the Plaintiff disclosed information regarding her investigative findings about the nine providers identified in paragraph 11 of this Complaint to various federal and state governmental agencies including the New Mexico Attorney General's Office (AG), the New Mexico Human Services

Department's Quality Assurance Bureau (QAB) and Medicaid Fraud Division, the New Mexico Department of Health's Developmental Disabilities Support Division (DDSD), the Child Protective Services Division of the Children, Youth, and Families Department (CYFD), the New Mexico Corrections Department, San Juan County, the San Juan County's Sheriffs' Department, the Federal Bureau of Investigation, and the Drug Enforcement Administration.

17. The Defendants knew that the Plaintiff had disclosed information about her investigative findings to these governmental agencies.

## Family Connections Investigation

18. Prior to October of 2011, the New Mexico Corrections Department notified Elizabeth Martin, orally and in writing, that NMCD was receiving multiple reports and complaints from probationers that behavioral health services which probationers were required to receive as a condition of their probation were not being provided by Family Connections and that NMCD believed that Family Connections had billed for and had been reimbursed under the Medicaid program for providing behavioral health services to these individuals for services that had not been provided.

19. Elizabeth Martin, Pam Valencia, and investigators within the SIU did not respond to NMCD's reports and complaints or forward those reports to the State of New Mexico. Marilyn Van Horn and Patricia LeFort took no action to investigate or otherwise look into those complaints to ascertain their veracity.

20. At a meeting, Van Horn and LeFort instructed Plaintiff to not pursue the investigation and to not reply to requests being made by NMCD officials.

21.     In November of 2011, Plaintiff initiated an investigation into these reports and complaints after receiving additional reports and complaints from Amy Pearson, a hearing officer employed by the Probation and Parole Division of the New Mexico Corrections Department, that Family Connections was not providing probationers with court mandated behavioral services.

22.     Plaintiff' investigation determined and Plaintiff reported to LeFort, Valencia and Danninger, that:

    a.  Family Connections had been submitting CMS form 1500s, the federal form used by behavioral health care providers to seek Medicaid reimbursement, which claimed that a single, individual employee of Family Connections had provided between 18 and 26 hours of treatment a day;

    b.  Family Connections' billings were false, and Family Connections had over-billed the Medicaid program;

    c.  The individual claiming to provide behavioral health services on behalf of Family Connections was not licensed to provide the services Family Connections had billed Medicaid for;

    d.  Family Connections had no other employee who was licensed to provide those services; and

    e.  Family Connections claims for payment for those services was contrary to the requirements of the Medicaid General and Behavioral Health Provider Policies.

23.     On January 5, 2012, Plaintiff conducted an audit of Family Connections which determined that:

a. Family Connection's client files did not contain treatment plans, treatment notes or other documentation showing what services had been provided to clients or which supported the claims for Medicaid payment that had been submitted by Family Connections as required by MAD-MR:08-11; NMAC §8.302.1.17;42 C.F.R. 431.107(b); §27-11-1 et seq.;

b. Family Connections had submitted claims for payment to the Medicaid program and received payment of claims for group therapy services that had been provided by the patients themselves, rather than licensed, qualified professionals; and

c. Family Connections had submitted claims for and received payment for allegedly providing services to a probationer who had absconded and was no longer in the county where Family Connections provided services.

24.     Patricia LeFort, who was present at the audit conducted by the Plaintiff, falsely represented the findings of that investigation as well as the statements made by probationers ordered to receive care at Family Connections who were interviewed during the course of the Plaintiff's investigation, and failed to take any action to investigate this provider, seek recoupment of the monies already paid to it, or stop further payments to Family Connections. Specifically, LeFort reported that the interviewees had stated they had received treatment when in fact the interviewees stated they had not received treatment.

25.     In and after January of 2012, the Plaintiff notified the Defendants and representatives of the New Mexico Attorney General's Office and the New Mexico Human Services Department's Quality Assurance Bureau (QAB) of her investigative findings at monthly QAB meetings which are were attended by Strauss and Popillo.

26.     In April of 2012, the Defendant's agents acted to conceal this subcontractor's non-compliance with Medicaid rules and regulations and its false billings when they failed to respond to requests from the New Mexico Attorney General's office for an accounting review of this subcontractor's claims.

## Ann Morrow Investigation

27.     In November and December of 2011, Plaintiff conducted an audit and investigation of subcontractor provider, Ann Morrow & Associates.

28.     Van Horn and Popillo told the Plaintiff to not investigate this provider.

29.     Plaintiff's audit and investigation determined that:

a.   Ann Morrow submitted false claims for payment to the Medicaid program which used the billing code for "insight oriented psychotherapy" when the actual services rendered were teaching a client activities such as how to brush their teeth and were therefore not eligible for Medicaid reimbursement under the billing code used by this subcontractor;

b.   Ann Morrow had billed for services that were not in fact provided and had provided treatment that was not medically necessary;

c.   Ann Morrow had billed Medicaid for providing interactive therapy to clients who were non-verbal and thus unable to physically participate in interactive therapy, for psychotherapy which was not provided, for individual therapy under a higher paying billing code when only group therapy, which was supposed to be billed under a different, lower paying code had been provided;

d.  Ann Morrow routinely double billed Medicaid and other government funding sources;

e.  Ann Morrow submitted claims for payment for behavioral support counseling which had been provided by therapists who were not licensed to provide such services and who were therefore ineligible for Medicaid reimbursement;

f.  Ann Morrow had engaged in "upcoding" by:

   i.  Using the higher paying billing code for psychotherapy when only community based support services had been provided;

   ii.  Using code 90806 which was to be used to bill for face to face individual psychotherapy, 45-60 minutes in duration, when in fact it had provided services to clients who were not physically or developmentally capable of engaging in such treatment;

   iii.  Using code 90808 for face to face, individual psychotherapy of 75 to 80 minutes in duration to bill Medicaid when it actually provided group therapy which was supposed to be billed under a different, lower paying code;

   iv.  Using code 90853 to bill Medicaid when it provided group therapy to developmentally disabled clients who did not have the capacity for insight oriented psychotherapy, despite the fact Medicaid regulations require that persons receiving such services have the capacity for insight oriented psychotherapy, and at the same time;

      v.      Using codes 90806 and 90808 to bill Medicaid and other federally funded programs for the same services twice;

      vi.      Using code 96101, a code used to bill for testing and reporting by a psychiatrist or medical doctor, to bill Medicaid for neurological assessments that had been performed by an administrative assistant who was not licensed or otherwise qualified to provide such services, and who was therefore not eligible to be reimbursed under Medicaid rules and regulations.

30.    The Plaintiff disclosed the findings of her audit and investigation to representatives of the New Mexico Attorney General's Office and the Human Services Department at monthly QAB meetings, and in reports and e-mails submitted to the State of New Mexico.

31.    Popillo and Strauss attended those QAB meetings and knew that the Plaintiff reported her findings to the New Mexico Human Services department and representatives of the New Mexico Attorney General's Office.

32.    After the Plaintiff reported information regarding Ann Morrow's submission of false claims for payment to the State of New Mexico, Plaintiff's supervisors verbally reprimanded her for causing the State to investigate this provider.

33.    After Evans met with Popillo about the Plaintiff's investigation of Ann Morrow, Popillo admonished the Plaintiff's and told her that OHNM had been receiving letters from Morrow's attorneys and that Evans was "tired of taking heat" because of the Plaintiff's

investigation and reporting of Morrow's submission of false claims for payment to the Medicaid program to the State of New Mexico.

34.     Popillo and LeFort both informed the Plaintiff that, because of their discussions with Evans, they wanted the Plaintiff to stop investigating Morrow.

**Gerard Weideman Investigation**

35.     Plaintiff's audit and investigation of subcontractor behavioral health service provider Gerard Weideman ("Weideman") determined that:

    a.  Weideman had submitted bills for providing group therapy to 20 to 40 child clients at a time and was submitting claims for payment to the Medicaid program for 15 to 20 hours a day of such services.  The State of New Mexico's rules and regulations set a limit of eight to twelve children in a group therapy context;

    b.  Weideman had submitted and was continuing to submit claims to Medicaid for mental health care and psychotherapy services when in fact no such services had been provided;

    c.  Weideman had billed Medicaid for these services when they had been provided by an unlicensed or otherwise qualified individual, and that those claims were therefore not eligible for reimbursement under the Medicaid program;

    d.  Weideman had worked three days per week yet, on average, billed Medicaid for twelve thirty-minute individual psychotherapy sessions under code 90804, twelve family psychotherapy sessions (without a client being present) under code 90846, 23 children in group therapy under code 90853, and 32 children in group

interactive psychotherapy under code 90857 each day, which would take a minimum of 15 hours a day to provide;

 e. Weideman submitted claims for payment to the Medicaid program under a code that was used to bill Medicaid for the provision of therapy to adults when this provider was actually providing interactive group therapy to children under the age of twelve. The code used by this provider paid more than the code which was supposed to be used to bill Medicaid for providing therapy to children, under the age of twelve who, according to applicable regulations, do not have the developmental capacity to participate in group therapy; and

 f. Weideman billed for providing therapy to clients three times a week which, under Medicaid regulations, is referred to as Intensive Outpatient Treatment, even though there was no documentation to support the claims that such intensive therapy had been provided or that such therapy was medically necessary; and

 g. Weideman's billing practices violated NMAC 16.27.18(E) and 8.310.8.13.

36. Plaintiff informed Evans, Popillo and representatives of HSD and the New Mexico Attorney General's Office of her findings and determinations at monthly QAB meetings and in written reports submitted to the State of New Mexico.

37. Defendants knew the Plaintiff had disclosed this information to governmental agencies.

**Carlsbad Mental Health Center Investigation**

38. For over a year prior to October of 2011, OHNM received multiple calls and at least one facsimile from employees and a manager of Carlsbad Mental Health Center (CMHC)

12

on its fraud/abuse tip line reporting that this provider was directing its employees to submit claims for payment to Medicaid for one set of services that had not been provided, instead of billing for the services that had been provided because the payout to the provider was greater.

39.     OHNM did not respond to these calls or investigate these reports and continued to pay CMHC under the Medicaid program.

40.     When confronted with this fact by the Plaintiff, Van Horn informed the Plaintiff that no action had been taken because CMHC was "a big player in the state", that OHNM already had problems with the State because its contractually mandated claims edit system, which was supposed to identify and prevent false billing, did not work, and that OHNM did not want to draw attention to themselves by going after a big provider such as CMHC.

41.     In July of 2011, two employees of CMHC reported to OHNM that CMHC management instructed staff to bill Medicaid for services provided to clients when clients were not present, and to bill for the same service as if provided at two different locations at the same time in order to maximize the amount of reimbursement.

42.     An audit and investigation conducted by the Plaintiff discovered that:

a.     CMHC had been double billing for the same services by submitting bills for the same services to the Medicaid program and the Behavioral Health Services Division of NMDOH;

b.     CMHC had billed for providing eight hours of services to clients when CMHC's documentation showed those clients were only present for five hours;

c.     CMHC had submitted claims that were not supported by patient documentation; and

d.  CMHC was improperly billing for behavioral health services that were being provided by van drivers and other persons not qualified or licensed to provide those services and who were therefore ineligible to receive reimbursement under the Medicaid program.

43.    Plaintiff informed Van Horn and Popillo, of these practices.  Popillo then met with Van Horn and Vogel about Plaintiff 's findings regarding CMHC.

44.    After meeting with Van Horn and Vogel, Popillo told the Plaintiff to stop her investigation of CMHC, and not to irritate the CEO of CMHC by uncovering false claims because the CEO of CMHC was politically connected and doing so would cause problems for OHNM.  Van Horn admitted she was aware CMHC was submitting false claim but that OHNM could not take action against CMHC because it would cause problems for OHNM with the State of New Mexico, and instructed the Plaintiff not to talk to anyone with the State.

45.    The Plaintiff did not follow these instructions and instead notified representatives of HSD and the Attorney General's Office about the findings of her investigation of CMHC and provided a recorded statement to Attorney General representatives.

46.    Strauss knew Plaintiff had disclosed the findings of her investigation to HSD and to the Attorney General, and had provided a recorded statement to the Attorney General for the State of New Mexico.

47.    The Plaintiff was then contacted by a representative of the New Mexico Attorney General's office who wanted to speak with the Plaintiff about CMHC.  Plaintiff was ordered by LeFort and Popillo not to respond to the AG's requests for information and assistance.

48.     The Plaintiff was subsequently told by Strauss, that he had read a copy of the Plaintiff's report on CMHC and that her report said she did not think false claims were being submitted by this provider.  In fact, the Plaintiff's report made no such statements and had requested the New Mexico Attorney General's office to investigate CMHC's false claims.

49.     On April 5 2012, LeFort told the Plaintiff and other SIU investigators to suspend all on site audits.

<b>New Mexico Psychiatric Services Investigation</b>

50.     In December of 2011, the Plaintiff initiated an audit and investigation of subcontractor behavioral health service provider New Mexico Psychiatric Services Corporation (NMPS).

51.     The Plaintiff's audit and investigation revealed that:

   a.   NMPS had been billing for medication management for drugs that had been prescribed by a secretary who was not authorized, qualified or licensed to prescribe medicine, and whose services were therefore not eligible for reimbursement under the Medicaid program, and

   b.   NMPS' records showed that NMPS had billed Medicaid for providing 30 to 90 minutes of psychotherapeutic treatment to 20 to 30 patients a day, and claimed that one provider saw that number of patients each day.

52.     Several psychotherapy billing codes used by NMPS including code 90847, are time dependent, meaning that the person providing the services was required to spend a certain amount of time with a patient in order to be eligible to be reimbursed under the Medicaid

program. Claims submitted under code 90847 require that one hour of psychotherapy services be provided in order for a provider to be eligible for reimbursement under the Medicaid program.

53. The Plaintiff's audit and investigation of NMPS determined that:

   a. NMPS did not have documentation in its patient files supporting NMPS' claims it had provided one hour of psychotherapy which this provider had billed for under code 90847;

   b. NMPS's only licensed psychotherapist in the Albuquerque office was not providing psychotherapeutic services and that NMPS was submitting claims for reimbursement for such services through the Medicaid program;

   c. NMPS' Roswell office was billing Medicaid for medication management and family psychotherapy for all of its clients who were children, and that NMPS did not maintain documentation which supported its claims that it was providing psychotherapy to these child patients;

   d. NMPS was billing for services allegedly provided by Dr. Babak Mirin, that Dr. Mirin did not actually see or provide services to patients, that NMPS had billed Medicaid for services allegedly provided by Dr. Mirin in different parts of the state and that the services NMPS had billed for had actually been provided by other providers in violation of NMAC 16.27.18.18; and

   e. NMPS had falsely billed Medicaid prior to December 7, 2011, for at least $1,187,366.10, when it submitted claims for reimbursement for psychotherapy services even though it did not have a credentialed psychotherapist at any of its facilities and was therefore ineligible to bill Medicaid for providing

psychotherapy to Medicaid clients. Plaintiff also determined that NMPS was billing for these services under Dr. Babak Mirin's name when those services had actually been provided by two unlicensed graduate students in violation of NMAC 8.310.8.16 which prohibits a Medicaid provider from billing for services rendered by someone other than himself, and NMAC 16.27.18.19 which prohibits a Medicaid provider from delegating professional responsibilities to unqualified persons.

54. In or about February 2012, Plaintiff disclosed her findings to representatives of the Attorney General's office and HSD at a QAB meeting and in an e-mail to HSD.

55. The Defendants knew Plaintiff had made these disclosures to the Attorney General and HSD.

56. Popillo ordered the Plaintiff to "not have any conversations" about any of her audits or investigation of this provider with OHNM employees despite the fact the Plaintiff had conducted her investigations of this provider in conjunction with OHNM personnel from OHNM's Quality Improvement and Provider Relations units.

57. On April 5, 2012, LeFort told the Plaintiff and other SIU investigators to suspend all on sit audits.

**Covenant Child, Inc., Investigation**

58. During the course of her employment, the Plaintiff also investigated subcontractor behavioral health service provider, Covenant Child, Inc. ("Covenant").

59. Plaintiff's investigation determined Covenant had been billing Medicaid for services provided by a medical doctor when in fact it did not have a medical doctor at its facility

and had used improper billing codes which resulted in Covenant receiving more money that it was entitled to receive.

60.     Plaintiff was instructed by Van Horn not to report this finding to the State of New Mexico because if these claims were reported, the State would learn that OHNM's contractually mandated claims edit system, which was supposed to identify and prevent false billing, did not work.

61.     Plaintiff disclosed her findings regarding Covenant representatives of HSD and the Attorney General's Office.

62.     Plaintiff told Defendants that Covenant was willing to pay OHNM back the difference between what Covenant should have received as reimbursement under the correct codes, and what it actually received using the wrong codes, for all bills it had submitted under improper codes, a total of approximately $86,000.

63.     Defendants knew Plaintiff had made these disclosures to governmental agencies.

64.     On April 5, 2012, LeFort told the Plaintiff and other SIU investigators to suspend all on site audits.

### Dr. Cynthia King Investigation

65.     During the course of her employment, the Plaintiff investigated subcontractor behavioral health service provider, Dr. Cynthia King ("King").

66.     Plaintiff discovered that:

a.     King was using a high level, high paying code which can only be used to bill for an intensive three hour monitoring and assessment of patients and that King's office's documentation did not support claims under such codes, and that the

18

services that had been provided and billed under Dr. King's name had actually been provided by social workers in violation of Medicaid rules and regulations including NMAC 8.310.8.16, which prohibits billing Medicaid for services rendered by anyone other than the actual provider, NMAC 16.27.18.18 (Q)(1), which requires that the identity of the actual provider be used on billing documents, and NMAC 16.27.18.19, which prohibits a licensed professional from delegating professional responsibilities to unqualified persons;

b.   King diagnosed all of her clients as having autism even though other licensed mental health workers did not reach the same diagnosis. Under Medicaid rules and regulations, a diagnosis of autism permits the provider to bill for services under both medical and mental health billing codes;

c.   and King's diagnoses of autism was used to support her billing for the same services under both medical and mental health codes and her use of billing codes which paid more than the amounts King was entitled to receive in violation of Medicaid rules and regulations including NMAC 16.27.18.18.

67.    The Plaintiff disclosed her findings to HSD and representatives of the Attorney General's Office.

68.    The Defendants knew that the Plaintiff had disclosed this information to governmental agencies.

### Presbyterian Medical Services, Inc. Investigation

69.    During the course of her employment, the Plaintiff audited and investigated subcontractor behavioral health service provider, Presbyterian Medical Services, Inc. ("PMS").

19

70.     On and before February 23, 2012, OHNM received several complaints about this provider from the New Mexico Children Youth and Families Department, state juvenile probation officers, and from calls to its fraud and abuse tip line by employees of PMS regarding inadequate treatment and abuse of patients at PMS facilities in Farmington, New Mexico.

71.     These reports and complaints included reports that PMS was unlawfully discharging patients from its facilities, and keeping Medicaid patients in the facility for much longer periods of time than was clinically warranted or medically necessary in violation of Medicaid rules including NMAC 16.27.18.18.

72.     OHNM did not refer this information to State investigators for prolonged periods of time in violation of its contract with the State and Medicaid rules and regulations.

73.     By no later than February 26, 2012, the Plaintiff forwarded the PMS's employees' complaints to the New Mexico Attorney General's Office, Medicaid Fraud Division, and began an investigation of those reports.

74.     Defendants knew the Plaintiff had disclosed this information to these entities.

75.     On March 27, 2012, the Plaintiff traveled to Farmington, New Mexico, to conduct her investigation of this provider, and returned to Albuquerque on March 29, 2012.

76.     The Plaintiff's audit and investigation determined that:

a.  OHNM's Utilization Specialist, who had approved the extension of stays for Medicaid patients being served by PMS, had been instructed by OHNM's management to approve all stays for PMS Farmington because PMS' payout from OHNM was lower than the state average and because OHNM wanted this

provider, which OHNM knew was having financial problems, to remain in business;

b.  PMS' documentation was insufficient to support its claims for payment under the Medicaid program in violation of Medicaid rules including NMAC 8.302.1.17 and 42 C.F.R. §431.107(b);

c.  PMS had destroyed social worker notes showing that sexual abuse of clients was ongoing at this facility and rewrote the social worker notes to delete all references to such abuse;

d.  Personnel at PMS' Farmington office were not trained as required by law and were therefore ineligible to bill under the Medicaid program; and

e.  PMS had falsified billing time sheets used to support billings submitted to the Medicaid program records.

77.  On March 29, 2012, the Plaintiff disclosed he information she had discovered as a result of her audit and investigation to Tracy Townsend.

78.  Immediately after the Plaintiff returned from visiting PMS' Farmington office, Defendant's agents, Martin and Townsend visited PMS' Farmington offices.

79.  On March 30, 2012, three days after the Plaintiff had gone to Farmington and one day after she initiated her audit and investigation of PMS and disclosed her investigative findings to Defendant's agents, Plaintiff was informed by LeFort that she was under investigation, to stop work on her investigation of this provider, and to not speak with anyone regarding her investigation.

80.     The Plaintiff was further informed that if she did speak with anyone about PMS she would be fired by OHNM.

81.     In April of 2012, Popillo and LeFort told the Plaintiff that they were in communication with OHNM officials and that those officials were displeased with the Plaintiff's investigation of PMS.

82.     On April 5, 2012 LeFort instructed the Plaintiff and other investigators to suspend all on site audits.

83.     In the first week of April 2012, after OHNM received calls from the New Mexico Attorney General's Office regarding PMS, Popillo instructed the Plaintiff not to return those calls or talk to anyone about PMS or her investigation of PMS, and to stop her investigation of PMS.

84.     On the morning of Monday, April 9, 2012, Plaintiff met with agents from the Federal Bureau of Investigations to report the findings of her investigation of PMS.

85.     On the afternoon of April 9, 2012, shortly after Plaintiff met with agents from the FBI, Plaintiff's employment was terminated.

86.     The Defendants knew the Plaintiff had disclosed information about her investigation of PMS to the FBI prior to terminating her.

## COUNT I - WHISTLEBLOWER RETALIATION UNDER §44-9-11

87.     Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

88.     Plaintiff Clark brings this claim against Defendants UHG and UHS pursuant to §44-9-11 NMSA 2007.

89.     In the course of her employment, the Plaintiff discovered information regarding the submission of false and fraudulent claims by the nine behavioral health providers identified in ¶11, and by Defendants and their agents, subsidiaries and subcontractors that violated the FCA, 32 U.S.C. §§3729, *et seq.*, and the FATA, NMSA 1978 §§ 44-9-1, *et seq.*.  Plaintiff also discovered information about the Defendants' efforts to conceal this wrongdoing from the State of New Mexico.

90.     Plaintiff reported that information to New Mexico State and Federal government and law enforcement officials.

91.     In retaliation for the Plaintiff reporting suspected fraud and abuse on the part of the nine providers identified in ¶11, and by Defendants and their agents, subsidiaries, and subcontractors with regard to the submission of false claims to the Medicaid and other federally and state funded programs, Defendants, and its agents, threatened and harassed Clark, and then terminated the Plaintiff's employment.

92.     The Plaintiff suffered damages as a proximate result of the Defendant's retaliatory actions, has lost wages and benefits, has incurred special damages, and is entitled to an award of compensatory damages in an amount to be determined by the finder of fact including but not limited to an award of double back pay with interest pursuant to §44-9-11(C) NMSA.

93.     The retaliatory actions of Defendant were willful, wanton and in reckless disregard of Plaintiff's rights entitling her to an award of punitive damages in an amount to be determined by the finder of fact.

WHEREFORE, Plaintiff Karen Clark prays that judgment be entered in her favor against Defendants UnitedHealth Group, Inc., and UnitedHealthcare Services, Inc., awarding her double

back pay plus interest, compensation for all special damages incurred by the Plaintiff as a result of her termination, punitive damages, reasonable attorney fees, pre and post judgment interest, and litigation costs incurred by her in bringing this action and any other relief the Court deems proper.

## COUNT II – RETALIATORY DISCHARGE

94.　　Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

95.　　New Mexico has enunciated a clear public policy protecting its citizens from being retaliated against in the terms and conditions of their employment for their disclosing information about the misuse of government funds and suspected fraud, waste and abuse by government contractors and violations of state laws to their employer and to the government. See, NMSA 1978 §§ 10-16C-1, *et seq.*; NMSA 1978 § 44-9-11.

96.　　Plaintiff's audits and investigations of suspected fraud, waste and abuse by behavioral health providers who were paid with federal and state funds, her reporting the findings to her employer and its agents, and her reporting her findings to federal and state governmental agencies were all acts that are authorized and encouraged by New Mexico's public policy.

97.　　The Defendants terminated the Plaintiff's employment in retaliation for her having engaged in those acts.

98.　　The Defendants' actions in terminating Plaintiff's employment proximately caused the Plaintiff to suffer damages for which she is entitled to an award of compensatory damages in an amount to be determined by the finder fact.

99.     The acts of the Defendants were willful, wanton, and in reckless disregard of the Plaintiff's rights entitling Plaintiff to an award of punitive damages in an amount to be determined by the finder of fact.

WHEREFORE, Plaintiff Karen Clark prays that judgment be entered in her favor against Defendants UnitedHealth Group, Inc., and UnitedHealthcare Services, Inc., awarding her compensatory and punitive damages in an amount to be determined at trial, pre and post judgment interest, and litigation costs incurred by her in bringing this action and any other relief the Court deems proper.

Respectfully submitted,

SANDERS & WESTBROOK, PC

*/s/ Duff Westbrook*
Duff Westbrook
Maureen Sanders
Brian L. Moore
102 Granite Ave. NW
Albuquerque, NM 87102
(505) 243-2243

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of October, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Joshua Grabel, Esq.
John C. West, Esq.
Matthew Park, Esq.
LEWIS ROCA ROTHGERBER LLP
*Attorney for Defendants*
jgrabel@lrrc.com
jwest@lrrc.com
mpark@lrrc.com